**DAWN DONUT COMPANY, Inc., Plaintiff-Appellant,**

**v.**

**HART'S FOOD STORES, INC. and Starhart Bakeries, Inc., Defendants-Appellants.**

**No. 108, Docket 25110.**

United States Court of Appeals Second Circuit.

Argued Dec. 9, 1958.

Decided May 21, 1959.

Townsend F. Beaman, Jackson, Mich. (Charles Shepard, Rochester, N. Y., on the brief), for plaintiff-appellant.

Justin L. Vigdor, Rochester, N. Y. (MacFarlane, Harris, Martin, Kendall & Dutcher, Rochester, N. Y., on the brief), for defendants-appellees.

Before CLARK, Chief Judge, and HINCKS and LUMBARD, Circuit Judges.

LUMBARD, Circuit Judge.

The principal question is whether the plaintiff, a wholesale distributor of doughnuts and other baked goods under its federally registered trademarks "Dawn" and "Dawn Donut," is entitled under the provisions of the Lanham Trade-Mark Act to enjoin the defendant from using the mark "Dawn" in connection with the retail sale of doughnuts and baked goods entirely within a six county area of New York State surrounding the city of Rochester. The primary difficulty arises from the fact that although plaintiff licenses purchasers of its mixes to use its trademarks in connection with the retail sales of food products made from the mixes, it has not licensed or otherwise exploited the mark at the retail level in defendant's market area for some thirty years.

We hold that because no likelihood of public confusion arises from the concurrent use of the mark in connection with retail sales of doughnuts and other baked goods in separate trading areas, and because there is no present likelihood that plaintiff will expand its retail use of the mark into defendant's market area, plaintiff is not now entitled to any relief under the Lanham Act, 15 U.S.C.A. § 1114. Accordingly, we affirm the district court's dismissal of plaintiff's complaint.

This is not to say that the defendant has acquired any permanent right to use the mark in its trading area. On the contrary, we hold that because of the effect of the constructive notice provision of the Lanham Act, should the plaintiff expand its retail activities into the six county area, upon a proper application and showing to the district court, it may enjoin defendant's use of the mark.

With respect to defendant's counterclaim to cancel plaintiff's registration on the ground that its method of licensing its trademarks violates the Lanham Act, a majority of the court holds that the district court's dismissal of defendant's counterclaim should be affirmed. They conclude that the district court's finding that the plaintiff exercised the degree of control over the nature and quality of the products sold by its licensees required by the Act was not clearly erroneous, particularly in view of the fact that the

defendant had the burden of proving its claim for cancellation. I dissent from this conclusion because neither the finding of the trial judge nor the undisputed evidence in the record indicates the extent of supervision and control actually exercised by the plaintiff.

We are presented here with cross-appeals from a judgment entered by the District Court for the Western District of New York dismissing both plaintiff's complaint for infringement of its federally registered trademarks and defendant's counterclaim to cancel plaintiff's federal registrations.

Plaintiff, Dawn Donut Co., Inc., of Jackson, Michigan since June 1, 1922 has continuously used the trademark "Dawn" upon 25 to 100 pound bags of doughnut mix which it sells to bakers in various states, including New York, and since 1935 it has similarly marketed a line of sweet dough mixes for use in the baking of coffee cakes, cinnamon rolls and oven goods in general under that mark. In 1950 cake mixes were added to the company's line of products. Dawn's sales representatives call upon bakers to solicit orders for mixes and the orders obtained are filled by shipment to the purchaser either directly from plaintiff's Jackson, Michigan plant, where the mixes are manufactured, or from a local warehouse within the customer's state. For some years plaintiff maintained a warehouse in Jamestown, New York, from which shipments were made, but sometime prior to the commencement of this suit in 1954 it discontinued this warehouse and has since then shipped its mixes to its New York customers directly from Michigan.

Plaintiff furnishes certain buyers of its mixes, principally those who agree to become exclusive Dawn Donut Shops, with advertising and packaging material bearing the trademark "Dawn" and permits these bakers to sell goods made from the mixes to the consuming public under that trademark. These display materials are supplied either as a courtesy or at a moderate price apparently to stimulate and promote the sale of plaintiff's mixes.

The district court found that with the exception of one Dawn Donut Shop operated in the city of Rochester, New York during 1926–27, plaintiff's licensing of its mark in connection with the retail sale of doughnuts in the state of New York has been confined to areas not less than 60 miles from defendant's trading area. The court also found that for the past eighteen years plaintiff's present New York state representative has, without interruption, made regular calls upon bakers in the city of Rochester, N. Y., and in neighboring towns and cities, soliciting orders for plaintiff's mixes and that throughout this period orders have been filled and shipments made of plaintiff's mixes from Jackson, Michigan into the city of Rochester. But it does not appear that any of these purchasers of plaintiff's mixes employed the plaintiff's mark in connection with retail sales.

The defendant, Hart Food Stores, Inc., owns and operates a retail grocery chain within the New York counties of Monroe, Wayne, Livingston, Genesee, Ontario and Wyoming. The products of defendant's bakery, Starhart Bakeries, Inc., a New York corporation of which it is the sole stockholder, are distributed through these stores, thus confining the distribution of defendant's product to an area within a 45 mile radius of Rochester. Its advertising of doughnuts and other baked products over television and radio and in newspapers is also limited to this area. Defendant's bakery corporation was formed on April 13, 1951 and first used the imprint "Dawn" in packaging its products on August 30, 1951. The district court found that the defendant adopted the mark "Dawn" without any actual knowledge of plaintiff's use or federal registration of the mark, selecting it largely because of a slogan "Baked at midnight, delivered at Dawn" which was originated by defendant's president and used by defendant in its bakery opera-

tions from 1929 to 1935. Defendant's president testified, however, that no investigation was made prior to the adoption of the mark to see if anyone else was employing it. Plaintiff's marks were registered federally in 1927, and their registration was renewed in 1947. Therefore by virtue of the Lanham Act, 15 U.S.C.A. § 1072, the defendant had constructive notice of plaintiff's marks as of July 5, 1947, the effective date of the Act.

Defendant's principal contention is that because plaintiff has failed to exploit the mark "Dawn" for some thirty years at the retail level in the Rochester trading area, plaintiff should not be accorded the exclusive right to use the mark in this area.[1]

We reject this contention as inconsistent with the scope of protection afforded a federal registrant by the Lanham Act.

Prior to the passage of the Lanham Act courts generally held that the owner of a registered trademark could not sustain an action for infringement against another who, without knowledge of the registration, used the mark in a different trading area from that exploited by the registrant so that public confusion was unlikely. Hanover Star Milling Co. v. Metcalf, 1916, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713; cf. White Tower System, Inc. v. White Castle System of Eating Houses Corporation, 6 Cir., 1937, 90 F.2d 67, certiorari denied, 1937, 302 U.S. 720, 58 S.Ct. 41, 82 L.Ed. 556; Note, Developments in the Law of Trade-Marks and Unfair Competition, 68 Harv.L.Rev. 814, 857–858 (1955). By being the first to adopt a mark in an area without knowledge of its prior registration, a junior user of a mark could gain the right to exploit the mark exclusively in that market.

But the Lanham Act, 15 U.S.C.A. § 1072, provides that registration of a trademark on the principal register is constructive notice of the registrant's claim of ownership. Thus, by eliminating the defense of good faith and lack of knowledge, § 1072 affords nationwide protection to registered marks, regardless of the areas in which the registrant actually uses the mark. Sterling Brewing, Inc. v. Cold Spring Brewing Corp., D.C.D.Mass.1951, 100 F.Supp. 412, 418, modified on rehearing, D.C.D.Mass.1952, 92 U.S.P.Q. 37; Roberts, Commentary on the Lanham Trade-Mark Act, 15 U.S.C.A. pp. 272, 280; Amdur, Trade-Mark Law and Practice (1948) pp. 332–333; Note, Developments in the Law of Trade-Marks and Unfair Competition, 68 Harv. L.Rev. 814, 828, 859; Note, 100 U.Pa.L. Rev. 1075 (1952); Note, 21 St. John's L. Rev. 209, 220–221 (1947); Van Valkenburg, The New Trade-Mark Law, 20 Rocky Mt.L.Rev. 76, 80 (1947).

That such is the purpose of Congress is further evidenced by 15 U.S.C.A. § 1115(a) and (b) which make the certificate of registration evidence of the registrant's "exclusive right to use the * * * mark in commerce."[2] "Commerce" is defined in 15 U.S.C.A. § 1127 to include all the commerce which may lawfully be regulated by Congress. These two provisions of the Lanham Act make it plain that the fact that the defendant employed the mark "Dawn," without actual knowledge of plaintiff's registration, at the retail level in a limited geographical area of New York state before the plaintiff used the mark in that market, does not entitle it either to exclude the plaintiff from using the mark in that area or to use the mark concur-

1. Although the district court did not decide whether the marks as used by the parties were confusingly similar, the defendant argues that we should hold as a matter of law that they are not, but, as our opinion discloses, our view is to the contrary.

2. 15 U.S.C.A. § 1115(a) provides that the certificate of a registered mark shall be "prima facie" evidence of the right of exclusive use and 15 U.S.C.A. § 1115(b) provides that if the mark has become incontestable, see 15 U.S.C.A. § 1065, the certificate shall be "conclusive" evidence of the right.

rently once the plaintiff licenses the mark or otherwise exploits it in connection with retail sales in the area.

Plaintiff's failure to license its trademarks in defendant's trading area during the thirty odd years that have elapsed since it licensed them to a Rochester baker does not work an abandonment of the rights in that area. We hold that 15 U.S.C.A. § 1127, which provides for abandonment in certain cases of non-use,[3] applies only when the registrant fails to use his mark, within the meaning of § 1127, anywhere in the nation. Since the Lanham Act affords a registrant nationwide protection, a contrary holding would create an insoluble problem of measuring the geographical extent of the abandonment. Even prior to the passage of the Lanham Act, when trademark protection flowed from state law and therefore depended on use within the state, no case, as far as we have been able to ascertain, held that a trademark owner abandoned his rights within only part of a state because of his failure to use the mark in that part of the state. Cf. Jacobs v. Iodent Chemical Co., 3 Cir., 1930, 41 F.2d 637.

Accordingly, since plaintiff has used its trademark continuously at the retail level, it has not abandoned its federal registration rights even in defendant's trading area.

We reject defendant's further claim that plaintiff is prevented by laches from enjoining defendant's use of the mark "Dawn" upon doughnuts and other baked and fried goods. Defendant argues that plaintiff's New York sales representative, one Jesse Cohn, who also represented several other companies besides plaintiff, called upon defendant on a monthly basis, and that about four years prior to the commencement of this law suit he observed boxes bearing the label "Dawn" on the desk of one Jack Solomon, defendant's bakery manager. At the trial Cohn denied that he ever saw any packaging in defendant's bakery for baked and fried goods bearing the label Dawn, although he admitted seeing some packages for other food products in defendant's bakery bearing the mark "Dawn." The district court held that since Cohn's contacts with the defendant were on behalf of companies other than the plaintiff, the knowledge of Cohn would not be imputed. We agree with the district court's conclusion.

The defendant, by raising the defense of laches, asserts that plaintiff, or because the plaintiff is a corporation, those corporate officers of the plaintiff responsible for instituting legal proceedings against unauthorized users of plaintiff's trademark, forbore from initiating any proceedings against the defendant when they knew or should have known of its use of plaintiff's mark, and thus allowed the defendant to expand its efforts to develop the mark in a false atmosphere of security. But since it is not shown that plaintiff's New York sales representative Cohn at any time had any duty to investigate whether bakers, such as the defendant, who did not purchase mixes from the plaintiff and who were not authorized to use its trademark, were in fact using the mark, his knowledge of defendant's use, whatever it may actually have been, cannot be imputed to the plaintiff. In order to impute an agent's knowledge to a principal in a particular transaction, it must be shown that the agent at some time had some duties to perform on behalf of the principal with respect to the transaction, although the agent need not have acquired his knowledge in connection with those duties. Restatement of Agency 2d, § 272 and appendix to § 272 at p. 450. The plaintiff is therefore not estopped by reason of laches from enforcing its exclusive

3. 15 U.S.C.A. § 1127 provides: "A mark shall be deemed to be 'abandoned'—

"(a) When its use has been discontinued with intent not to resume. Intent not to resume may be inferred from circumstances. Nonuse for two consecutive years shall be prima facie abandonment.

"(b) When any course of conduct of the registrant, including acts of omission as well as commission, causes the mark to lose its significance as an indication of origin."

right to use its registered trademarks in defendant's trading area.

Accordingly, we turn to the question of whether on this record plaintiff has made a sufficient showing to warrant the issuance of an injunction against defendant's use of the mark "Dawn" in a trading area in which the plaintiff has for thirty years failed to employ its registered mark.

The Lanham Act, 15 U.S.C.A. § 1114, sets out the standard for awarding a registrant relief against the unauthorized use of his mark by another. It provides that the registrant may enjoin only that concurrent use which creates a likelihood of public confusion as to the origin of the products in connection with which the marks are used. Therefore if the use of the marks by the registrant and the unauthorized user are confined to two sufficiently distinct and geographically separate markets, with no likelihood that the registrant will expand his use into defendant's market,[4] so that no public confusion is possible, then the registrant is not entitled to enjoin the junior user's use of the mark. See, Fairway Foods, Inc. v. Fairway Markets, Inc., 9 Cir., 1955, 227 F.2d 193; Note, Developments in the Law of Trade-Marks and Unfair Competition, 68 Harv. L.Rev. 814, 857–60 (1955); cf. Sterling Brewery, Inc. v. Cold Springs Brewing Corp., supra.

As long as plaintiff and defendant confine their use of the mark "Dawn" in connection with the retail sale of baked goods to their present separate trading areas it is clear that no public confusion is likely.

The district court took note of what it deemed common knowledge, that "retail purchasers of baked goods, because of the perishable nature of such goods, usually make such purchases reasonably close to their homes, say within about 25 miles, and retail purchases of such goods beyond that distance are for all practical considerations negligible." No objection is made to this finding and nothing appears in the record which contradicts it as applied to this case.

Moreover, we note that it took plaintiff three years to learn of defendant's use of the mark and bring this suit, even though the plaintiff was doing some wholesale business in the Rochester area. This is a strong indication that no confusion arose or is likely to arise either from concurrent use of the marks at the retail level in geographically separate trading areas or from its concurrent use at different market levels, viz. retail and wholesale in the same area.

The decisive question then is whether plaintiff's use of the mark "Dawn" at the retail level is likely to be confined to its current area of use or whether in the normal course of its business, it is likely to expand the retail use of the mark into defendant's trading area. If such expansion were probable, then the concurrent use of the marks would give rise to the conclusion that there was a likelihood of confusion.

The district court found that in view of the plaintiff's inactivity for about

4. To sustain a claim for injunctive relief, the plaintiff need not show that the marks are actually being used concurrently in the same trading area. Since the statutory standard for the invocation of injunctive relief is the likelihood of confusion, it is enough that expansion by the registrant into the defendant's market is likely in the normal course of its business. Even prior to the passage of the Lanham Act the courts held that the second user of a mark was not entitled to exclude the registered owner of the mark from using it in a territory which the latter would probably reach in the normal expansion of his business. See Hanover Star Milling Co. v. Metcalf, 1916, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713; White Tower System, Inc. v. White Castle System of Eating Houses Corporation, 6 Cir., 1937, 90 F.2d 67, certiorari denied, 1937, 302 U.S. 720, 58 S.Ct. 41, 82 L.Ed. 556; Note, 68 Harv.L.Rev. 814, 857 (1955). Certainly, under the Lanham Act, evincing a congressional purpose to afford a registrant nationwide protection, the subsequent user is not entitled to any greater immunity.

thirty years in exploiting its trademarks in defendant's trading area at the retail level either by advertising directed at retail purchasers or by retail sales through authorized licensed users, there was no reasonable expectation that plaintiff would extend its retail operations into defendant's trading area. There is ample evidence in the record to support this conclusion and we cannot say that it is clearly erroneous.

We note not only that plaintiff has failed to license its mark at the retail level in defendant's trading area for a substantial period of time, but also that the trend of plaintiff's business manifests a striking decrease in the number of licensees employing its mark at the retail level in New York state and throughout the country. In the 1922–1930 period plaintiff had 75 to 80 licensees across the country with 11 located in New York. At the time of the trial plaintiff listed only 16 active licensees not one of which was located in New York.[5]

The normal likelihood that plaintiff's wholesale operations in the Rochester area would expand to the retail level is fully rebutted and overcome by the decisive fact that plaintiff has in fact not licensed or otherwise exploited its mark at retail in the area for some thirty years.

Accordingly, because plaintiff and defendant use the mark in connection with retail sales in distinct and separate markets and because there is no present prospect that plaintiff will expand its use of the mark at the retail level into defendant's trading area, we conclude that there is no likelihood of public confusion arising from the concurrent use of the marks and therefore the issuance of an injunction is not warranted. *A fortiori* plaintiff is not entitled to any accounting or damages. However, because of the effect we have attributed to the constructive notice provision of the Lanham Act, the plaintiff may later, upon a proper showing of an intent to use the mark at the retail level in defendant's market area, be entitled to enjoin defendant's use of the mark.

Since we have held that upon a proper subsequent showing the plaintiff may be entitled to injunctive relief, it is appropriate that we answer here the defendant's argument that such relief is beyond the constitutional reach of Congress because the defendant uses the mark only in intrastate commerce. Clearly Congress has the power under the commerce clause to afford protection to marks used in interstate commerce. That being so, the only relevant question is whether the intrastate activity forbidden by the Act is "sufficiently substantial and adverse to Congress' paramount policy declared in the Act. * * *" Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 1948, 334 U.S. 219, 234, 68 S.Ct. 996, 1005, 92 L. Ed. 1328. The answer to such an inquiry seems plain in this case. If a registrant's right to employ its trademark were subject within every state's borders to preemption or concurrent use by local business, the protection afforded a registrant by the Lanham Act would be rendered virtually meaningless. Therefore we think it is within Congress' "necessary and proper" power to preclude a local intrastate user from acquiring any right to use the same mark. See Lorain Journal Co. v. United States, 1951, 342 U.S. 143, 152, 72 S.Ct. 181, 96 L.Ed. 162; Wickard v. Filburn, 1942, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122; cf. also, Lyon v. Quality Courts United, Inc., 6 Cir., 1957, 249 F.2d 790, 795; Iowa Farmers Union v. Farmers' Educational & Coop. Union, 8 Cir., 1957, 247 F.2d 809, 815–816; Pure Foods, Inc. v. Minute Maid Corp., 6 Cir., 1954, 214 F.2d 792, 795–796.

Plaintiff also asserts a right to injunctive relief based upon state law.

5. One bakery shop, located in Potsdam, N. Y., which is approximately 200 miles from Rochester, applied for a license franchise after the commencement of this litigation.

Plaintiff maintains that under the law of New York injunctive relief against trademark infringement has been granted to prevent the likelihood of dilution of the distinctive quality of the trademark, even in the absence of competition and confusion. Judge Weinfeld has said that the underlying rationale of this so-called dilution doctrine "is that the gradual diminution or whittling away of the value of a trademark, resulting from extensive use by another of a mark identical or similar to that of the senior user, constitutes an invasion of the senior user's property right in his trademark and gives right to actionable wrong. The wrong, under this theory, is not dependent upon a showing of competitive relationship of the products or the likelihood of confusion." G. B. Kent & Sons, Limited v. P. Lorillard Co., D.C.S.D.N.Y. 1953, 114 F.Supp. 621, 630, affirmed per curiam, 2 Cir., 1954, 210 F.2d 953.

Section 368-c of New York's General Business Law may provide relief against dilution of a trademark but plaintiff has not registered its mark in New York and the first sentence of § 368-c limits protection therein provided to owners of marks registered under New York law. Plaintiff is therefore remitted to his common law rights. Section 368-d of the General Business Law.

Although at common law New York courts on occasion have granted injunctive relief in the absence of direct competition, plaintiff has cited us no New York case which has awarded such relief in a situation comparable to the one presented here. We think that most of the New York decisions which may appear to afford such protection may be distinguished for the reasons advanced in G. B. Kent & Sons, Limited v. P. Lorillard Co., supra, 114 F.Supp. at pages 630–631.

But even if New York common law afforded trademarks protection from the mere fact of concurrent use by another, such relief would be provided only in the case of a mark which has a well established secondary meaning with the consuming public within the state. Cf. Tiffany & Co. v. Tiffany Productions, Inc., 147 Misc. 679, 264 N.Y.S. 459, affirmed 1 Dept., 1932, 237 App.Div. 801, 260 N.Y.S. 821, affirmed 1933, 262 N.Y. 482, 188 N.E. 30. See also Food Fair Stores, Inc. v. Food Fair, Inc., 1 Cir., 1951, 177 F.2d 177, 185. Here plaintiff has failed to introduce any evidence that the use of its mark in connection with retail sales had come to mean to retail purchasers in the Rochester area or in any part of New York State that the goods were made from its mixes. Accordingly, we find no basis for affording plaintiff injunctive relief at this time.

The final issue presented is raised by defendant's appeal from the dismissal of its counterclaim for cancellation of plaintiff's registration on the ground that the plaintiff failed to exercise the control required by the Lanham Act over the nature and quality of the goods sold by its licensees.

We are all agreed that the Lanham Act places an affirmative duty upon a licensor of a registered trademark to take reasonable measures to detect and prevent misleading uses of his mark by his licensees or suffer cancellation of his federal registration. The Act, 15 U.S.C.A. § 1064, provides that a trademark registration may be cancelled because the trademark has been "abandoned." And "abandoned" is defined in 15 U.S.C.A. § 1127 to include any act or omission by the registrant which causes the trademark to lose its significance as an indication of origin.

Prior to the passage of the Lanham Act many courts took the position that the licensing of a trademark separately from the business in connection with which it had been used worked an abandonment. Reddy Kilowatt, Inc. v. Mid-Carolina Electric Cooperative, Inc., 4 Cir., 1957, 240 F.2d 282, 289; American Broadcasting Co. v. Wahl Co., 2 Cir., 1941, 121 F.2d 412, 413; Everett O. Fisk & Co. v. Fisk Teachers' Agency, Inc., 8 Cir., 1924, 3 F.2d 7, 9. The theory of these cases was that:

"A trade-mark is intended to identify the goods of the owner and to

safeguard his good will. The designation if employed by a person other than the one whose business it serves to identify would be misleading. Consequently, 'a right to the use of a trade-mark or a trade-name cannot be transferred in gross.'" American Broadcasting Co. v. Wahl Co., supra, 121 F.2d at page 413.

Other courts were somewhat more liberal and held that a trademark could be licensed separately from the business in connection with which it had been used provided that the licensor retained control over the quality of the goods produced by the licensee. E. I. DuPont de Nemours & Co. v. Celanese Corporation of America, 1948, 167 F.2d 484, 35 CCPA 1061, 3 A.L.R.2d 1213; see also 3 A.L.R.2d 1226, 1277–1282 (1949) and cases there cited. But even in the DuPont case the court was careful to point out that naked licensing, viz. the grant of licenses without the retention of control, was invalid. E. I. DuPont de Nemours & Co. v. Celanese Corporation of America, supra, 167 F.2d at page 489.

The Lanham Act clearly carries forward the view of these latter cases that controlled licensing does not work an abandonment of the licensor's registration, while a system of naked licensing does. 15 U.S.C.A. § 1055 provides:

> "Where a registered mark or a mark sought to be registered is or may be used legitimately by related companies, such use shall inure to the benefit of the registrant or applicant for registration, and such use shall not affect the validity of such mark or of its registration, provided such mark is not used in such manner as to deceive the public."

And 15 U.S.C.A. § 1127 defines "related company" to mean "any person who legitimately controls or is controlled by the registrant or applicant for registration in respect to the nature and quality of the goods or services in connection with which the mark is used."

Without the requirement of control, the right of a trademark owner to license his mark separately from the business in connection with which it has been used would create the danger that products bearing the same trademark might be of diverse qualities. See American Broadcasting Co. v. Wahl Co., supra; Everett O. Fisk & Co. v. Fisk Teachers' Agency, Inc., supra. If the licensor is not compelled to take some reasonable steps to prevent misuses of his trademark in the hands of others the public will be deprived of its most effective protection against misleading uses of a trademark. The public is hardly in a position to uncover deceptive uses of a trademark before they occur and will be at best slow to detect them after they happen. Thus, unless the licensor exercises supervision and control over the operations of its licensees the risk that the public will be unwittingly deceived will be increased and this is precisely what the Act is in part designed to prevent. See Sen. Report No. 1333, 79th Cong., 2d Sess. (1946). Clearly the only effective way to protect the public where a trademark is used by licensees is to place on the licensor the affirmative duty of policing in a reasonable manner the activities of his licensees.

The critical question on these facts therefore is whether the plaintiff sufficiently policed and inspected its licensees' operations to guarantee the quality of the products they sold under its trademarks to the public. The trial court found that: "By reason of its contacts with its licensees, plaintiff exercised legitimate control over the nature and quality of the food products on which plaintiff's licensees used the trademark 'Dawn.' Plaintiff and its licensees are related companies within the meaning of Section 45 of the Trademark Act of 1946." It is the position of the majority of this court that the trial judge has the same leeway in determining what constitutes a reasonable degree of supervision and control over licensees under the facts and circumstances of the par-

ticular case as he has on other questions of fact; and particularly because it is the defendant who has the burden of proof on this issue they hold the lower court's finding not clearly erroneous.

I dissent from the conclusion of the majority that the district court's findings are not clearly erroneous because while it is true that the trial judge must be given some discretion in determining what constitutes reasonable supervision of licensees under the Lanham Act, it is also true that an appellate court ought not to accept the conclusions of the district court unless they are supported by findings of sufficient facts. It seems to me that the only findings of the district judge regarding supervision are in such general and conclusory terms as to be meaningless. In the absence of supporting findings or of undisputed evidence in the record indicating the kind of supervision and inspection the plaintiff actually made of its licensees, it is impossible for us to pass upon whether there was such supervision as to satisfy the statute. There was evidence before the district court in the matter of supervision, and more detailed findings thereon should have been made.

Plaintiff's licensees fall into two classes: (1) those bakers with whom it made written contracts providing that the baker purchase exclusively plaintiff's mixes and requiring him to adhere to plaintiff's directions in using the mixes; and (2) those bakers whom plaintiff permitted to sell at retail under the "Dawn" label doughnuts and other baked goods made from its mixes although there was no written agreement governing the quality of the food sold under the Dawn mark.[6]

The contracts that plaintiff did conclude, although they provided that the purchaser use the mix as directed and without adulteration, failed to provide for any system of inspection and control. Without such a system plaintiff could not know whether these bakers were adhering to its standards in using the mix or indeed whether they were selling only products made from Dawn mixes under the trademark "Dawn."

The absence, however, of an express contract right to inspect and supervise a licensee's operations does not mean that the plaintiff's method of licensing failed to comply with the requirements of the Lanham Act. Plaintiff may in fact have exercised control in spite of the absence of any express grant by licensees of the right to inspect and supervise.

The question then, with respect to both plaintiff's contract and non-contract licensees, is whether the plaintiff in fact exercised sufficient control.

Here the only evidence in the record relating to the actual supervision of licensees by plaintiff consists of the testimony of two of plaintiff's local sales representatives that they regularly visited their particular customers and the further testimony of one of them, Jesse Cohn, the plaintiff's New York representative, that "in many cases" he did have an opportunity to inspect and observe the

6. On cross-examination plaintiff's president conceded that during 1949 and 1950 the company in some instances, the number of which is not made clear by his testimony, distributed its advertising and packaging material to bakers with whom it had not reached any agreement relating to the quality of the goods sold in packages bearing the name "Dawn." It also appears from plaintiff's list of the 16 bakers who were operating as exclusive Dawn shops at the time of the trial that plaintiff's contract with 3 of these shops had expired and had not been renewed and that in the case of 2 other such shops the contract had been renewed only after a substantial period of time had elapsed since the expiration of the original agreement. The record indicates that these latter 2 bakers continued to operate under the name "Dawn" and purchase "Dawn" mixes during the period following the expiration of their respective franchise agreements with the plaintiff. Particularly damaging to plaintiff is the fact that one of the 2 bakers whose franchise contracts plaintiff allowed to lapse for a substantial period of time has also been permitted by plaintiff to sell doughnuts made from a mix other than plaintiff's in packaging labeled with plaintiff's trademark.

operations of his customers. The record does not indicate whether plaintiff's other sales representatives made any similar efforts to observe the operations of licensees.

Moreover, Cohn's testimony fails to make clear the nature of the inspection he made or how often he made one. His testimony indicates that his opportunity to observe a licensee's operations was limited to "those cases where I am able to get into the shop" and even casts some doubt on whether he actually had sufficient technical knowledge in the use of plaintiff's mix to make an adequate inspection of a licensee's operations.

The fact that it was Cohn who failed to report the defendant's use of the mark "Dawn" to the plaintiff casts still further doubt about the extent of the supervision Cohn exercised over the operations of plaintiff's New York licensees.

Thus I do not believe that we can fairly determine on this record whether plaintiff subjected its licensees to periodic and thorough inspections by trained personnel or whether its policing consisted only of chance, cursory examinations of licensees' operations by technically untrained salesmen. The latter system of inspection hardly constitutes a sufficient program of supervision to satisfy the requirements of the Act.

Therefore it is appropriate to remand the counterclaim for more extensive findings on the relevant issues rather than hazard a determination on this incomplete and uncertain record. I would direct the district court to order the cancellation of plaintiff's registrations if it should find that the plaintiff did not adequately police the operations of its licensees.

But unless the district court finds some evidence of misuse of the mark by plaintiff in its sales of mixes to bakers at the wholesale level, the cancellation of plaintiff's registration should be limited to the use of the mark in connection with sale of the finished food products to the consuming public. Such a limited cancellation is within the power of the court. Section 1119 of 15 U.S.C.A. specifically provides that "In any action involving a registered mark the court may * * * order the cancellation of registrations, in whole or in part, * * *" Moreover, partial cancellation is consistent with § 1051(a) (1) of 15 U.S.C.A., governing the initial registration of trademarks which requires the applicant to specify "the goods in connection with which the mark is used and the mode or manner in which the mark is used in connection with such goods * * *"

The district court's denial of an injunction restraining defendant's use of the mark "Dawn" on baked and fried goods and its dismissal of defendant's counterclaim are affirmed.